06-3493-ag, 06-3811-ag, 06-4102-ag, 06-5390
Rajah et al v. Mukasey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued in Tandem: November 21, 2007 Decided: September 24, 2008)

Docket No. 06-3493-ag
Docket No. 06-3811-ag
Docket No. 06-4102-ag
Docket No. 06-5390-ag

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MOHAMED RAJAH, SAID NAJIH, SAADE BENJELLOUN, SAMER EMILE EL ZAHR,
Petitioners,

-v.-
MICHAEL B. MUKASEY, ATTORNEY GENERAL OF THE UNITED STATES,[*]
MICHAEL CHERTOFF, SECRETARY OF THE DEPARTMENT OF HOMELAND
SECURITY, PETER SMITH, SPECIAL AGENT IN CHARGE OF THE NEW YORK
DISTRICT OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,[**]
Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:WINTER, WALKER, and CALABRESI, Circuit Judges.

Petitioners are aliens who responded to the Special Call-In

Registration Program instituted after the terrorist attacks on

September 11, 2001, and were subsequently placed in deportation

---

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey is automatically substituted for former Attorney General Alberto R. Gonzales as a respondent in this case.

[**]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Special Agent in Charge Peter Smith is substituted for former Special Agent in Charge Martin Ficke as a respondent in this case.

1

proceedings.  They petition for review of deportation orders issued by the Board of Immigration Appeals.  The petitioners make various regulatory, statutory, administrative, and constitutional arguments in support of their claims.  For the reasons stated below, we reject these claims and hold that the petitioners are deportable, with the exception of Petitioner Rajah.  Petitions denied in part, granted in part.

ANA C. POTTRATZ AND WNYONG AUSTIN, Lutheran Social Services of New York, New York, New York for Petitioners.

TOM DUPREE, Deputy Assistant Attorney General for Peter D. Keisler, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C. (Song E. Park on the brief for Mr. Rajah, James A. Hunolt on the brief for Mr. Najih, Leslie McKay on the brief for Mr. El Zahr, Jesse M. Bless on the brief for Mr. Benjelloun; M. Jocelyn Lopez Wright of counsel for Mr. Rajah and Mr. Najih, Linda S. Wernery of counsel for Mr. El Zahr, David V. Bernal of counsel for Mr. Benjelloun) for Respondents.

Lynn M. Kelly, Executive Director, Justice Center, New York City Bar Association, New York, New York (Linda Marie Kenepaske, Alice Morey, and Myriam Jaidi on the brief) for Amicus Curiae New York City Bar Association.

WINTER, Circuit Judge:

Mohamed Rajah, Said Najih, Saade Benjelloun, and Samer Emile El Zahr petition for review of deportation orders issued by the

Board of Immigration Appeals ("BIA").[1]  Each petitioner responded to a Special Call-In Registration Program ("Program"), after the terrorist attacks of September 11, 2001.  The Program required non-immigrant alien males over the age of 16 from designated countries to appear for registration and fingerprinting.  Following their registration, each petitioner was placed in deportation proceedings and ordered deported.  They challenge the deportation orders principally on the grounds that:  (i) the Program lacks statutory authorization;  (ii) the Program is invalid as a matter of administrative law; (iii) the Program violates equal protection; (iv) evidence obtained during the Program should be suppressed under the Fourth and Fifth Amendments; and (v) regulatory violations in the course of the Program require the vacating of their deportation orders.  Two petitioners make other claims specific to their cases.  With the exception of Rajah, we reject their arguments and deny the petitions for review for the reasons stated below.  We remand Rajah's case to the BIA on the grounds discussed by Judge Calabresi, in an opinion filed concurrently with this.  See Rajah v. Mukasey, ___ F.3d ___, No. 06-3493-ag (2d Cir. September 23,

---

[1]Abdulraqeeb Alqaidaei also petitioned for review of a deportation order and his petition was heard in tandem with the other petitioners.  After oral argument, Alqaidaei withdrew his petition for review.  Alqaidaei v. Mukasey, No. 06-3494 (2d Cir. Filed July 26, 2006) (dismissed July 25, 2008).

3

2008).

I.  BACKGROUND

   After the terrorist attacks of September 11, 2001, the Attorney General instituted the National Security Entry-Exit Registration System ("NSEERS").  NSEERS required the collection of data from aliens upon entry and periodic registration of certain aliens present in the United States.  Its purpose was to enhance the monitoring of aliens and the enforcement of immigration laws.[2]  The Special Call-In Registration Program was part of NSEERS.  It required alien males from certain designated countries who were over the age of 16 and who had not qualified for permanent residence to appear for registration and fingerprinting and to present immigration related documents.[3]

---

[2]For a description of the program's original aims, see John Ashcroft, Attorney General Prepared Remarks on the National Security Entry-Exit Registration System (June 6, 2002), http://www.usdoj.gov/archive/ag/speeches/2002/060502agpreparedremarks.htm.

[3]The outlines of the Program were set forth in an enabling regulation that read:
> The Attorney General, by publication of a notice in the Federal Register, also may impose such special registration, fingerprinting, and photographing requirements upon nonimmigrant aliens who are nationals, citizens, or residents of specified countries or territories (or a designated subset of such nationals, citizens, or residents) who have already been admitted to the United States or who are

Individuals who did not appear for required registrations were threatened with possible arrest. The affected countries were Muslim majority states and North Korea. The Program did not include citizens of these countries who were women, were under the age of 16, or were qualified to be permanent residents in this country. For those individuals whose immigration status was in order, registration generally had no special consequences. But for those individuals, such as the petitioners, whose immigration status was not in order, registration led to

otherwise in the United States.

8 C.F.R. 264.1(f)(4) (2003). See also Registration & Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584 (Dep't of Justice Aug. 12, 2002) (final rule) (promulgating the final enabling rule). The specific groups of aliens subject to registration were designated in a series of additional notices. See, e.g., Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 67,766 (Dep't of Justice Nov. 6, 2002) (notice). In all, aliens from 25 countries were subject to registration. The first group included Iran, Iraq, Libya, Sudan and Syria. Id. The second group included Afghanistan, Algeria, Bahrain, Eritrea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen. Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526 (Dep't of Justice Nov. 22, 2002) (notice). The third group included Pakistan and Saudi Arabia. Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642 (Dep't of Justice Dec. 18, 2002) (notice). The fourth group included Bangladesh, Egypt, Indonesia, Jordan, and Kuwait. Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2,363 (Dep't of Justice Jan. 16, 2003) (notice).

5

deportation proceedings.[4]

Although the experiences of the petitioners varied to some extent, they followed the same general pattern, deviations from which will be noted where relevant. Their experiences typically consisted of a registration day and an interrogation day.[5] On their registration days, petitioners appeared at the then-INS[6] facility at 26 Federal Plaza in New York City, filled out a few forms, and presented documentation or information, such as passports, immigration forms, or alien registration numbers. At the end of the registration day, they were instructed to return on a subsequent day on which they were interrogated. On their interrogation days, the petitioners were generally taken to the

---

[4]See Department of Homeland Security, Fact Sheet; Changes to National Security Entry/Exit Registration System (NSEERS) (2003), http://www.dhs.gov/xnews/releases/press_release_0305.shtm (last visited June 30, 2008).

[5]Benjelloun was registered on April 24, 2003, and interrogated on June 17, 2003. Najih was registered on April 24, 2003, and interrogated on June 4, 2003. Rajah was registered on January 9, 2003, and interrogated on April 22, 2003. The only exception to the two-day rule is El Zahr, who was both registered and interrogated on September 5, 2003.

[6]The Immigration and Naturalization Service became part of the Department of Homeland Security on March 1, 2003. Press Release, United States Department of Homeland Security, Department of Homeland Security Facts for March 1, 2003 (Feb. 28, 2003, available at http://www.dhs.gov/xnews/releases/press_release_0100.shtm.

10th floor of 26 Federal Plaza and subjected to questioning. This questioning was frequently preceded by a pat-down search and often occurred in a closed room while the petitioners were seated on a chair that had shackles attached, although none of the petitioners were shackled. At some point, petitioners received a Notice to Appear for removal proceedings. Some were then placed in holding cells for a period of time.

In the removal proceedings, the petitioners argued, inter alia, that the Program was not authorized by statute and was unconstitutional. They also contended that their hearings should be terminated without prejudice to renewal due to various alleged regulatory violations committed by the then-INS, discussed in detail infra. Immigration Judges ("IJs") declined to rule on the ultra vires and constitutional claims as outside their adjudicatory powers. Although the IJs' opinions differed in some respects, they also held that any regulatory violations that may have occurred did not require termination of the proceedings or suppression of any crucial evidence. The IJs then found the petitioners removable based on the information presented in the course of their registration and interrogation. The BIA upheld the IJs' decisions in their essential respects.

These petitions for review followed.

II. DISCUSSION

Petitioners mount a variety of legal challenges to the

7

Program and the deportation proceedings brought against them. However, no claim is made that they were, or are, in the country legally or entitled to asylum or withholding of removal; it is therefore undisputed that they are deportable.

Their challenges, then, claim that their deportation proceedings were so tainted by the Program and associated events that we should, for prophylactic purposes, either prevent their deportation altogether, suppress evidence of their deportability collected in the course of the Program, or require that the deportation proceedings be rerun.

a)  Legality of the Program

1)  Statutory Authorization

Petitioners argue that the Attorney General had no statutory authority to enact the Program.  If the Program was in fact simply rogue conduct by immigration authorities, some remedy, the dimensions of which we need not address, would be called for. Cf. Montilla v. INS, 926 F.2d 162, 169 (2d Cir. 1991) (noting that agencies that exhibit carelessness in complying with their own rules undermine public confidence).  However, statutory authorization for the Program is abundant.

Title 8 U.S.C. § 1303(a)[7] grants the Attorney General broad

_____

[7] 8 U.S.C. § 1303(a) reads, in its entirety:
        Notwithstanding the provisions of sections
        1301 and 1302 of this title, the Attorney
        General is authorized to prescribe special

power to prescribe regulations for "registration and fingerprinting" of certain classes of aliens. Among the enumerated classes of aliens subject to such rules is a catch-all provision including "aliens of any other class not lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1303(a). This language facially authorizes the Program, which prescribed registration for a class of aliens who had not qualified for permanent residency. See Kandamar v. Gonzales, 464 F.3d 65, 73 (1st Cir. 2006) (noting that 8 U.S.C. §§ 1305 and 1303(a) "give[] the Attorney General great latitude in setting special registration requirements")

Petitioners note that the Program classifies on the basis of nationality. They then argue that, because national-origin classifications are often disfavored, see, e.g., 42 U.S.C. § 2000a(a) (forbidding discrimination in public accommodations based on national origin), Section 1303(a) should be construed to avoid such classifications. However, immigration regulation

> regulations and forms for the registration and fingerprinting of (1) alien crewmen, (2) holders of border-crossing identification cards, (3) aliens confined in institutions within the United States, (4) aliens under order of removal, (5) aliens who are or have been on criminal probation or criminal parole within the United States, and (6) aliens of any other class not lawfully admitted to the United States for permanent residence.

differs fundamentally from the legal contexts relied upon because classifications on the basis of nationality are frequently unavoidable in immigration matters. See, e.g., Romero v. INS, 399 F.3d 109, 112 (2d Cir. 2005) (discussing and upholding NACARA, a statute granting preferential immigration treatment to Cubans and Nicaraguans); Narenji v. Civiletti, 617 F.2d 745 (D.C. Cir. 1979) (discussing and upholding registration requirements targeting Iranian nationals). Given the importance to immigration law of, inter alia, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable. Indeed, the very concept of "alien" is a nationality-based classification.

In arguing for their proposed construction of the statute, petitioners rely upon the cannon of ejusdem generis. Ejusdem generis is "an aid to statutory construction problems suggesting that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." United States v. Turkette, 452 U.S. 576, 581 (1981). Petitioners assert that, because the other categories in Section 1303(a) are all immigration statuses or factors that could affect immigration status, see Note 6, supra, the catch-all provision should not be interpreted to authorize nationality-based distinctions.

10

Ejusdem generis has no relevance here.  The list of specific classes contained in Section 1303(a) contains a motley assortment of groups, including alien crewmen and aliens on parole or probation, so diverse that it provides no aid in construing the "any other class" language.  Therefore, we follow Section 1303(a)'s clear language that allows nationality-based classifications.  See Narenji, 617 F.2d at 747 (finding that 8 U.S.C. § 1303(a) allows the Attorney General to draw immigration distinctions based on nationality).

Petitioners also assert that, because Congress has proposed enforcement methods specifically targeted at terrorism, Section 1303(a) should not be interpreted to authorize the Program.  However, there is no tension whatsoever between Congress passing specific laws targeting terrorism and the Attorney General using broad powers granted under existing  statutes toward the same end.

A second statute authorizing the Program is Section 1305(b).[8]

---

[8]The relevant portion of 8 U.S.C. § 1305 reads:
> (b) Current address of natives of any one or more foreign states
>
> The Attorney General may in his discretion, upon ten days notice, require the natives of any one or more foreign states, or any class or group thereof, who are within the United States and who are required to be registered under this subchapter, to notify the Attorney General of their

11

It empowers the Attorney General to require "the natives of any one or more foreign states, or any class or group thereof . . . to notify the Attorney General of their current addresses and furnish such additional information as the Attorney General may require."  This reference to "additional information" is a broad grant of power and, on its face, authorizes the collection of information contemplated by the Program.[9]  See Kandamar, 464 F.3d at 73.  The petitioners attempt to restrict the reach of this statute to information about addresses, noting that the title of the subsection refers only to addresses.  However, "the title of a statute . . . cannot limit the plain meaning of the text."  Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1988)

> current addresses and furnish such additional information as the Attorney General may require.

The fact that the statute applies only to aliens "required to be registered under this subchapter" does not insulate the petitioners from its reach.  Title 8 U.S.C. § 1302 is part of the same subchapter as the instant statute and requires all aliens over 14 years of age in the United States for more than 30 days to be registered and fingerprinted, absent a waiver from the Attorney General.  8 U.S.C. § 1302.  The petitioners are therefore "required to be registered under this subchapter," as all those within the reach of the Program are over the age of 14.

[9]It is possible that the statute might be read not to authorize the gathering of information whose collection, in itself, might raise constitutional questions.  But none of what was sought under the Program before us is of that sort.  As a result, we express no view on such hypothetical fact gathering.

12

(internal quotation marks omitted).  Accordingly, 8 U.S.C. §
1305(b) also provides authority for the Program.

     2)  Administrative Law Challenges

     Petitioners next claim that the Program was invalidly
promulgated because the relevant regulations were not subject to
the required public notice and comment.  The Program was
implemented in two stages.  In the first stage, the Attorney
General promulgated a general enabling regulation that set forth
a framework for alien registration but did not designate specific
groups to be registered ("Enabling Regulation").  See 8 C.F.R. §
264.1(f)(4).  The Enabling Regulation was subjected to notice and
comment procedures.  See Registration & Monitoring of Certain
Nonimmigrants, 67 Fed. Reg. 40,581, 40,582 (Dep't of Justice June
13, 2002) (proposed rule).  In the second stage, the Attorney
General issued notices specifying the groups to be registered
("Group Specifications").  See, e.g., Registration of Certain
Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg.
67,766 (Dep't of Justice Nov. 6, 2002) (notice).  The Group
Specifications designated, inter alia, the countries whose
nationals were subject to the Program.  Promulgation of the Group
Specifications occurred without notice and comment, which in the
petitioners' view, was required by the Administrative Procedure
Act ("APA").  See 5 U.S.C. § 553 (describing the APA's notice and
comment requirement).  We disagree.

13

Although the Group Specifications would ordinarily be subject to notice and comment procedures, these procedures were not required here because the Group Specifications fell within the APA's foreign affairs exemption. The APA provides that notice and comment procedures do not apply to regulations involving "a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). "For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences." Zhang v. Slattery, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), superceded by statute on other grounds, by 8 U.S.C. § 1101(a)(42).

There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists.

Petitioners advance two principal counter-arguments. First, they assert that the foreign affairs exception is inapplicable

14

because the regulation itself did not contain a statement of the undesirable international consequences flowing from the application of notice and comment review. There is, however, no requirement that the rule itself state the undesirable consequences. Cf. Jean v. Nelson, 711 F.2d 1455, 1478 (11th Cir. 1983) (looking to the trial record to determine whether there were any definitively negative international consequences that would flow from notice and comment rulemaking), vacated and rev'd on other grounds, 727 F.2d 957 (1984) (en banc). This is particularly so when the consequences are seemingly as evident as they are in this case.

Petitioners also appear to assert that there is insufficient evidence that the group specification was tied to the President's foreign policy. Yassini v. Crosland, 618 F.2d 1356, 1361 (9th Cir. 1980) (upholding immigration restrictions on Iranian nationals during the hostage crisis after becoming satisfied that the then-INS Commissioner was acting to further policies expressed in a presidential directive and that the restrictions were enacted after consultation with the Attorney General -- who had in turn consulted the President about United States policy toward Iran). There is, however, no burden of proof to be carried with regard to a connection to the President's conduct of foreign affairs where the relevance to international relations is facially plain, and no presumption that a cabinet officer, such

15

as the Attorney General, is acting as a rogue until proven otherwise.  See Malek-Marzban v. INS, 653 F.2d 113, 115-16 (4th Cir. 1981) (upholding a similar INS action, reasoning that the foreign relations link was "obvious" and quoting the INS's own explanation of its activities that was published in the Federal Register); see also Nademi v. INS, 679 F.2d 811, 814 (10th Cir. 1982).  Moreover, the notice announcing the enabling regulation stated that, in deciding which countries to designate for registration, the Attorney General would confer with the Secretary of State, an officer who is well placed to be aware of the President's policy and to ensure that other officers conform to it.[10]  Registration & Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584, at 52,589 (Dep't of Justice Aug. 12, 2002) (final rule).

3) Equal Protection

Petitioners also argue that their deportation orders violate their rights under the Equal Protection component of the Fifth Amendment's Due Process Clause because the immigration laws were

---

[10]The notice stated, "The listing of countries from which nonimmigrant aliens will be subject to special registration is determined by the Attorney General in consultation with the Secretary of State, thereby ensuring that foreign policy implications will be considered when evaluating the possible designation of any specific country."  Registration & Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584, at 52,589 (Dep't of Justice Aug. 12, 2002) (final rule).

selectively enforced against them based on their religion, ethnicity, gender, and race. See United States v. Armstrong, 517 U.S. 456, 464 (1996) (noting that selective prosecution claims are cognizable under the Equal Protection component of the Fifth Amendment's Due Process Clause); see also Bolling v. Sharpe, 347 U.S. 497, 499 (1954) (noting that "discrimination may be so unjustifiable as to be violative of [the] due process [clause of the Fifth Amendment.]")  We agree that a selective prosecution based on an animus of that kind would call for some remedy. Cf. Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (stating the general grounds on which selective enforcement claims may be sustained).  In that regard, the Supreme Court has "not rule[d] out the possibility of a rare case in which the alleged basis of discrimination is so outrageous" that a selective enforcement challenge can be allowed in a deportation hearing despite the jurisdiction-stripping provisions of 8 U.S.C. § 1252(g).  Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 491 (1999); see also 8 U.S.C. § 1252(g) (providing that "no court shall have jurisdiction to hear any cause . . . on behalf of any alien arising from the decision . . . by the Attorney General to commence proceedings [or] adjudicate cases . . . against any alien under this chapter.").

Courts "have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the

17

Government's political departments largely immune from judicial control." Fiallo v. Bell, 430 U.S. 787, 792 (1977) (internal quotation marks omitted). Indeed, "[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review. Under this review, legislation will survive a constitutional challenge so long as there is a facially legitimate and bona fide reason for the law." Romero v. INS, 399 F.3d 109, 111 (2d Cir. 2005) (internal quotation marks omitted). "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. . . . [and must be upheld] [s]o long as [they] are not wholly irrational . . . ." Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979) (citations omitted).

No circumstance calling for a remedy is present here. There was a rational national security basis for the Program. The terrorist attacks on September 11, 2001 were facilitated by the lax enforcement of immigration laws. See Nat'l Comm'n on Terrorist Attacks upon the U.S., 9/11 Commission Report 384 (2004). The Program was designed to monitor more closely aliens from certain countries selected on the basis of national security criteria. See Registration & Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584 (Dep't of Justice Aug. 12, 2002) (final rule). The individuals subject to special registration under the Program were neither citizens nor even

18

lawful permanent residents.  They were asked to provide information regarding their immigration status and other matters relevant to national security.  They were not held in custody for appreciable lengths of time.  Those whose immigration status was not valid were subject to generally applicable legal proceedings to enforce pre-existing immigration laws.  In sum, the Program was a plainly rational attempt to enhance national security.  We therefore join every circuit that has considered the issue in concluding that the Program does not violate Equal Protection guarantees.  See Kandamar v. Gonzales, 464 F.3d 65, 73-74 (1st Cir. 2006); Ali v. Gonzales, 440 F.3d 678, 681 n.4 (5th Cir. 2006); Zafar v. U.S. Att'y Gen., 461 F.3d 1357, 1367 (11th Cir. 2006); Shaybob v. Att'y Gen., 189 Fed. Appx. 127, 129-30 (3d Cir. 2006); Hadayat v. Gonzales, 458 F.3d 659 (7th Cir. 2006) (finding that the court had no jurisdiction to review the claim); Malik v. Gonzales, 2007 WL 98115 (4th Cir. 2007).

To be sure, the Program did select countries that were, with the exception of North Korea, predominantly Muslim.  Petitioners argue, without evidence other than that fact, that the Program was motivated by an improper animus toward Muslims.  However, one major threat of terrorist attacks comes from radical Islamic groups.  The September 11 attacks were facilitated by violations of immigration laws by aliens from predominantly Muslim nations.  The Program was clearly tailored to those facts.  It excluded

19

males under 16 and females on the ground that military age men are a greater security risk. Muslims from non-specified countries were not subject to registration. Aliens from the designated countries who were qualified to be permanent residents in the United States were exempted whether or not they were Muslims. The program did not target only Muslims: non-Muslims from the designated countries were subject to registration. There is therefore no basis for petitioners' claim.

Petitioners also challenge the Program based on their perception of its effectiveness and wisdom. They argue, among other things, that it has not succeeded in catching many terrorists. However, we have no way of knowing whether the Program's enhanced monitoring of aliens has disrupted or deterred attacks. In any event, such a consideration is irrelevant because an ex ante rather than ex post assessment of the Program is required under the rational basis test. Sammon v. New Jersey Bd. of Med. Exam'rs, 66 F.3d 639, 645 (3d Cir. 1995) ("If the legislature [predicts that a statute] will serve the desired goal, the court is not authorized to determine whether . . . the desired goal has been served. The sole permitted inquiry is whether the legislature rationally might have believed . . . that the desired end would be served.") (emphasis added). Because we find that there was no circumstance present in the design and implementation of the Program calling for a remedy, we conclude

that the petitioners' selective enforcement under 8 U.S.C. § 1252(g) is unavailing.  See American-Arab Anti-Discrimination Comm., 525 U.S. at 490.

4) Fourth and Fifth Amendments

Petitioners claim that any evidence of their deportability obtained during the Program must be suppressed because it was the product of violations of the Fourth and Fifth Amendments.  There is no question that compliance with the Program was mandatory and that petitioners were required to produce documents and answer questions relevant to their immigration status.  There is also no question that the documents produced and answers given provided the evidence on which their deportation was ordered.

"In order to prove that an alien is subject to removal for overstaying his visa, DHS need only show that the alien was admitted as a nonimmigrant for a temporary period, that the period has elapsed, and that the nonimmigrant has not departed." Zerrei v. Gonzales, 471 F.3d 342, 345 (2d Cir. 2006) (internal quotation marks and ellipsis omitted).  In non-visa-overstay cases, "[t]he INS must show only identity and alienage; the burden then shifts to the respondent to prove the time, place and manner of his entry."  INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984); see also 8 U.S.C. § 1361.  As noted, the information collected during the registration and interrogation phases showed

21

that each petitioner was subject to removal, and the suppression of that evidence would undermine the existing deportation orders.

Aliens are generally subject to registration requirements as a condition of obtaining a visa and entering the country and, therefore, of remaining in it. See 8 U.S.C. § 1201(b) (requiring registration as part of most visa applications); 8 U.S.C. § 1304(d) (stating that all aliens who are required to register will be issued proof of registration). Aliens are also required to maintain and produce required documents regarding their status. See Kandamar, 464 F.3d at 74 ("Certainly, there can be little doubt about DHS's authority to inspect and photograph . . . passport[s] and other documentation."). Most non-immigrant aliens are issued I-94s[11] on their arrival in the United States, are required to keep their I-94s with them at all times, and are subject to criminal penalties for failing to do so. See 8 U.S.C. § 1304(e); United States v. Abrams, 427 F.2d 86, 91 (2d Cir. 1970). The obvious purpose of these requirements is to ensure

---

[11]The I-94 serves as proof that the alien has validly entered the country, see Department of Customs and Border Protection, FAQs on the Arrival-Departure Record (I-94 Form) & Crewman Landing Permit (I-95 Form) (Feb. 25, 2008), http://www.cbp.gov/xp/cgov/travel/id_visa/i-94_instructions/ arrival_departure_record.xml, has complied with certain registration requirements, see 8 C.F.R. § 264.1(a) (noting that the I-94 is proof of registration), and has a right to remain for a set time period.

22

that an alien's I-94 will be available for inspection by immigration enforcement officials under appropriate circumstances. The statutory framework also contemplates that aliens will possess valid passports while in the United States. As a condition of admission, entering non-immigrant aliens must have a passport valid for six months after the end date of their authorized stay. See 8 U.S.C. § 1182(a)(7)(B)(i)(I-II). As a result, each of the petitioners was obligated to provide just such evidence; none had the right to remain silent with regard to such matters; and none suffered a constitutional violation.

The Program was designed in large part to determine by an updated registration the status of the specified aliens and was clearly valid for reasons discussed above. The aliens in question had no right to remain in the country while not cooperating in the Program. They, therefore, had no right to remain silent or to decline to provide information relevant to immigration status.

In immigration proceedings, suppression of evidence is available only under limited circumstances under either the Fourth or Fifth Amendment. With regard to Fourth Amendment violations, suppression is warranted only when the evidence indicates "either (a) that an egregious violation that was fundamentally unfair has occurred, or (b) that the violation -- regardless of its egregiousness or unfairness -- undermine[s] the

23

reliability of the evidence in dispute." Almeida-Amaral v. Gonzales, 461 F.3d 231, 235 (2d Cir. 2006).

In the present matter, there was no Fourth Amendment violation, much less one that was egregious or that undermined the probative value of evidence collected. The Fourth Amendment does provide protection against random or gratuitous questioning related to an individual's immigration status. For example, government agents may not stop a person for questioning regarding his citizenship status without a reasonable suspicion of alienage. United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975); see also id. at 884 n.9 (reserving decision on whether that suspicion must be of illegal alienage or may be of mere alienage). However, the government does not violate the Fourth Amendment by obtaining documents or statements in the course of an alien's compliance with a statutorily authorized registration program.

An alien's presence in the country is conditioned upon compliance with such requirements. Immigration laws, difficult to enforce by their very nature, would become completely unenforceable if an alien, once in the country, could then refuse all compliance with requests for information relevant to immigration status from immigration authorities. Moreover, petitioners make no claim that any alleged Fourth Amendment violation undermined the probative value of documents or

24

statements taken from them.

Nor does the Fifth Amendment provide any grounds to suppress evidence collected from the petitioners on their interview days. We have noted that the Fifth Amendment protects aliens in deportation proceedings from procedures that transgress the fundamental notions of "fair play" that animate the Fifth Amendment. Montilla v. INS, 926 F.2d 162, 164 (2d Cir. 1991).

However, the Fifth Amendment does not protect an alien from having to provide information relevant to the registration that is a condition of their presence in the country. This information includes passports, I-94s, or other documents or oral statements regarding their immigration status.

The Fifth Amendment protects not only statements that are themselves evidence of criminal violations, but also "those [statements] which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." United States v. Hubbell, 530 U.S. 27, 38 (2000). Moreover, in limited circumstances, the act of producing a document can be testimonial, as when the act of producing the document is evidence that the document exists. See In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992, 1 F.3d 87, 93 (2d Cir. 1993). Forcing an alien to perform the act of producing a foreign passport, I-94, or statement regarding immigration status at least arguably forces the alien to admit alienage and thus

25

provide possible evidence of one or more crimes involving immigration violations.  See Lopez-Mendoza, 468 U.S. at 1038 (collecting statutes); see also 8 U.S.C. § 1302 (failure to register unless exempted by the attorney general); 8 U.S.C. § 1306 (willful failure to register); 8 U.S.C. § 1325 (evading inspection).  Therefore, an alien who is not in legal status could be exposed to further investigation and subsequent prosecution by producing a foreign passport, I-94, or statements regarding immigration status.

However, the Fifth Amendment does not protect the petitioners either from being forced to turn over their passports and I-94s or to answer questions related to their immigration status.  The Fifth Amendment is not an impediment to the enforcement of a valid civil regulatory regime.  This is so for three specific reasons.  First, the Fifth Amendment's act of production privilege does not cover records that are required to be kept pursuant to a civil regulatory regime.  In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21, 1985, 793 F.2d 69, 73 (2d Cir. 1986).  The documents at issue here are such "required records."  A central rationale for the required records rule is that "if a person conducts an activity in which record-keeping is required[,] . . . he may be deemed to have waived his privilege with respect to the act of production -- at least in cases in which there is a nexus between the government's production

26

request and the purpose of the record-keeping requirement." Id. The petitioners in our case voluntarily entered this country on the condition of maintaining the required documentation and thereby waived any right they might otherwise have had to refuse to produce those documents in response to immigration inquiries such as the Program. Just as a taxpayer's W-2 forms are required records not subject to the Fifth Amendment because they are a mandatory part of a civil regulatory regime, so too are the passports and I-94s at issue in the current case. Cf. In re Doe, 711 F.2d 1187, 1191 (2d Cir. 1983).

Second, the Program was a valid reporting requirement. Notwithstanding the protections of the Fifth Amendment, the government may require disclosure of information where the area of inquiry is regulatory rather than criminal, where the field subject to the disclosure obligation is not permeated with criminal statutes, and where there is a substantial non-prosecutorial interest served by the reporting regime. United States v. Dichne, 612 F.2d 632, 639-41 (2d Cir. 1979) (upholding the Bank Secrecy Act, which required reporting the transportation of more than $5,000 into or out of the United States). All of these criteria are satisfied by the Program. Immigration law is generally regulatory rather than criminal. Indeed, deportation hearings are civil proceedings. INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984). To be sure, there are some crimes related to

immigration violations.  But the level of criminal regulation in immigration matters is far less, and almost of a different order from that which governs those areas where reporting requirements have been struck down.  See Dichne, 612 F.2d at 640 (noting that reporting requirements invalidated by the Supreme Court generally required disclosure of "information which would almost necessarily provide the basis for criminal proceedings . . . for the very activity that [the subject of the reporting requirement] was required to disclose.").  Finally, the regulatory -- in contrast to criminal law enforcement -- interest in the Program is evident because the Program was designed to further protect national security interests by enhancing immigration law enforcement.  Accordingly, the Program was valid as a reporting requirement not subject to Fifth Amendment protections.

Third, because they were merely a condition on the continued receipt of an immigration benefit, the statements required by the program were not compelled for purposes of the Fifth Amendment. We have held that statements required as a condition of receiving a government benefit are not protected by the Fifth Amendment because they are not compelled.  See Ciccone v. Sec'y of Dep't of Health & Human Serv., 861 F.2d 14, 18 (2d Cir. 1988) (holding that statements required on an application for Social Security benefits are not compelled and therefore not protected).  The

statements required under the Program were merely a condition on the continued receipt of the government benefit of being allowed to remain in this country. Any alien who did not wish to register could avoid doing so because the notices requiring registration applied only to those who remained in the United States after a certain date. See, e.g., Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 67,766 (Dep't of Justice Nov. 6, 2002) (notice) (noting that the reporting requirement applies "only to certain nonimmigrant aliens from one of the countries designated in this Notice . . . who will remain until at least December 16, 2002."); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526 (Dep't of Justice Nov. 22, 2002) (notice); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642 (Dep't of Justice Dec. 18, 2002) (notice); and Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2,363 (Dep't of Justice Jan. 16, 2003). Although those subject to the Program were threatened with arrest if they failed to register, this fact does not alter the analysis. Aliens faced arrest only if they enjoyed the benefit without complying with the condition -- just as someone illegally receiving Social Security benefits faces arrest. Although to be sure, the petitioners were illegally present in the country, they enjoyed the de facto immigration benefit of

residing in the United States while under the protection of many of our laws.  For the foregoing reasons, there was therefore no Fifth Amendment privilege for the petitioners to refuse to produce immigration documents or to refuse to answer questions about their immigration status.

Of course, the foregoing discussion has no relevance to government inquiries that are focused on independent crimes only tangentially related to an alien's immigration status -- for example, questions about drug sales that might, if a conviction followed, constitute an aggravated felony requiring an alien's deportation.  See 8 U.S.C. § 1227(a)(2)(A)(iii) (requiring deportation of aliens who commit aggravated felonies).

b)  Regulatory Violations and Remedies

Petitioners argue that the INS violated a variety of its regulations in the course of registering, interrogating, and arresting them.  They further argue that the existence and nature of the regulatory violations call for some remedy.  In some instances, the petitioners did suffer regulatory violations.  In other instances -- for example, where there were insufficient factual findings made to enable definitive review -- we assume for purposes of argument that their rights under the regulations were violated.  In no instance, however, was a regulatory violation of a kind or a degree that would require suppression of evidence or termination of the proceedings with or without

30

prejudice to renewal.  We first discuss the claimed violations.

1) Regulatory Violations

A) Arrest Without Warrant: 8 C.F.R. § 287.8(c)(2)(ii)

Benjelloun, Najih, and El Zahr were arrested without a warrant on their investigation day.  That these arrests were in violation of 8 C.F.R. § 287.8(c)(2)(ii), which provides that "[a] warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained," is not seriously disputed.  Also, Rajah alleges facts that, if true, show that he was arrested without a warrant in violation of the regulations.  Although we have no findings on the issue from the BIA, we may assume that such a violation occurred because it does not affect our disposition of this matter.

B)   Failure of Arresting Officer to Identify Himself and Failure to State Reasons for Arrest:  8 C.F.R. § 287.8(c)(2)(iii)

Title 8 C.F.R. § 287.8(c)(2)(iii) provides:

> (iii) At the time of the arrest, the designated immigration officer shall, as soon as it is practical and safe to do so:
>
> (A) Identify himself or herself as an immigration officer who is

31

                          authorized to execute an arrest;
                          and

                          (B) State that the person is under
                          arrest and the reason for the
                          arrest.

     Three of the petitioners -- Najih, El Zahr, and Benjelloun

-- can either show, or allege facts that, if proven, would show,

a violation of this Section.  Najih and El Zahr were not informed

of their arrest until after substantial questioning had occurred,

and Benjelloun may not have been informed of his arrest at all.

Rajah does not argue that his rights under this section were

violated.

     With respect to Najih, Benjelloun and El Zahr, the IJs found

that this regulation was not violated because the petitioners

received various forms from the INS indicating that they were

being arrested and why they were being arrested at some point on

their interrogation day.  However, it may be that it was

"practical and safe" to provide notice once the petitioners

reached the 10th floor of 26 Federal Plaza.  The agents were

questioning aliens in the agency's own building in an environment

it controlled.  Before being admitted to the 10th floor -- or not

long afterwards -- the petitioners were searched.  Absent a

compelling reason to the contrary in a particular case, notice of

32

arrest could easily have been provided shortly after each petitioner reached the 10th floor rather than after questioning had continued for some time. We therefore assume the regulation was violated.

C)    Post Arrest Exam by Arresting Officer: 8 C.F.R. 287.3(a)

Two of the petitioners -- Najih and Rajah -- challenge rulings by the IJs that their rights under 8 C.F.R. § 287.3(a) were not violated. Title 8 C.F.R. § 287.3(a) provides:

> An alien arrested without a warrant of arrest . . . will be examined by an officer other than the arresting officer. If no other qualified officer is readily available and the taking of the alien before another officer would entail unnecessary delay, the arresting officer, if the conduct of such examination is a part of the duties assigned to him or her, may examine the alien.

It is not clear which party bears the burden of showing whether there was an officer, other than the arresting officer, available to conduct the examination. Putting the burden on the agency seems unreasonable. Demonstrating that all officers were otherwise occupied would require that the agency record in great detail and contemporaneously the actions of every officer at a given location during every working period. Putting the burden on the alien also seems unreasonable. Arrested aliens cannot learn of the idleness of immigration officers. In any event, we

33

need not determine where the burden lies because we may assume, for purposes of argument, that this regulation was violated with respect to all of the petitioners.

D)   Right to Counsel at Examination:  8 C.F.R. § 292.5(b)

Title 8 C.F.R. § 292.5(b) provides that: "[w]henever an examination is provided for in this chapter, the person involved shall have the right to be represented by an attorney or representative . . . ."  Although the petitioners allege that attorneys were not permitted on the 10th floor, none of the petitioners claims to have brought an attorney to his examination.  El Zahr claims that his Salvation Army caseworker was not permitted to accompany him to the 10th floor.  Even if true, this is not a violation, because she was neither an attorney nor a "representative" as specified in the regulations. See 8 C.F.R. 292.1(a).

E)   Coercion:  8 C.F.R. § 287.8(c)(2)(vii)

Title 8 C.F.R. § 287.8(c)(2)(vii) provides that "[t]he use of threats, coercion, or physical abuse by the designated immigration officer to induce a suspect to waive his or her rights or to make a statement is prohibited."

Determining when coercion has occurred is a fact-specific

inquiry. In re Garcia, 17 I. & N. Dec. 319, 320 (BIA 1980) (confession was involuntary when an alien was misinformed about his rights, his attempts to contact his lawyer were interfered with, and he spent substantial time in custody). Navia-Duran v. INS, 568 F.2d 803, 810 (1st Cir. 1977) (statements given by an alien arrested in the middle of the night, actively misinformed about her rights, and threatened with imminent deportation were involuntary). Bong Youn Choy v. Barber, 279 F.2d 642, 647 (9th Cir. 1960) (an alien's statements were involuntary when he was interrogated for seven hours, lasting into the early morning hours, and threatened with prosecution for perjury).

No petitioner claims to have either waived a right or made a statement as a result of such coercion. However, the regulatory language prohibits coercive conduct undertaken with a motive of seeking to elicit such a waiver or statement whether or not the conduct succeeds. Because we may assume that unproductive coercive conduct with the prohibited intent violates the regulation, it does not affect our disposition of this matter.

Each petitioner claims that the entire Program was coercive -- including both the registration and interrogation days. The petitioners' experiences during their registration days entailed nothing coercive for purposes of the regulation. They were asked

35

questions relevant to the Program by government officers and gave relevant statements or documents in response to those questions. As discussed infra, they had no right to remain silent or otherwise be uncooperative. Although the petitioners often may have endured long waits before their interviews, been interviewed under threat of criminal sanctions, and sometimes may have been subject to impolite treatment, none of these conditions rises to the level of coercion. Impoliteness and slow service are unfortunate, but not uncommon, characteristics of many ordinary interactions with government agencies, such as, for example, registering a motor vehicle. Moreover, the threat of criminal sanctions for willfully failing to provide required regulatory information does not make providing the information coercive in the sense of the regulation any more than laws prohibiting willful failure to file a tax return make the filing of a return a product of impermissible coercion.

Turning to the interrogation days, neither Benjelloun, Najih, nor Rajah were coerced. Their questioning did not involve the kind of circumstances that prior courts have found coercive, such as marathon questioning or misinformation as to their rights.

El Zahr's interrogation lasted seven hours but was interrupted twice when he was put in a cell, each time for short

periods of time. For much of the time he was interrogated, he was not told why the interrogation was taking place. He was not explicitly threatened or given misinformation about his rights. The IJ found the length of the interrogation to be coercive.

2. Remedies

We may, therefore, assume that significant regulatory violations took place with regard to each of the petitioners during the interrogation/arrest phase. We turn now to the possible remedies for such violations: (i) invalidation of the deportation orders with prejudice; (ii) suppression of all evidence obtained during the registration and interrogation phases; and (iii) terminating the deportation proceedings without prejudice to the starting of new deportation proceedings.

A) Invalidation of the Deportation Orders with Prejudice

We may assume, without deciding, that a regulatory violation or violations so egregious as to shock the conscience would call for invalidation of the deportation orders with prejudice to the renewal of deportation proceedings against a petitioner whose rights were violated. Cf. Almeida-Amaral v. Gonzales, 461 F.3d 231, 234 (2d Cir. 2006) (authorizing exclusion of evidence for, inter alia, egregious Fourth Amendment violations). By way of

37

contrast, conduct of a less culpable nature would not suffice to justify the draconian remedy of permanently preventing the deportation of an otherwise deportable alien.

None of the violations here approached such a level of egregiousness. Warrantless arrests were made, but, when made, there was a powerful showing of probable cause -- in fact, conclusive evidence of deportability. The failure to inform some petitioners of their arrest and reasons for it was entirely harmless, and the interrogation of El Zahr, while undoubtedly unpleasant, did not rise beyond the level of being long and tiresome.

B)  Suppression of Evidence

As noted earlier, we have held that suppression of evidence in immigration proceedings is warranted when an egregious or fundamentally unfair violation of applicable law occurred or when a violation of applicable law undermines the reliability of the evidence in question. See Almeida-Amaral, 461 F.3d at 234. Again, none of the regulatory violations here were egregious or fundamentally unfair or impaired the reliability of the evidence of petitioners' deportability.

The BIA's jurisprudence may differ somewhat. Under its caselaw, for regulatory violations not impacting fundamental rights, suppression is generally only available when (i) the

38

regulation was for the benefit of the alien, and (ii) the violation prejudiced the alien. In re Garcia-Flores, 17 I. & N. Dec. 325, 327-28 (BIA 1980). On the record before us, there is no reason to believe that the BIA failed to properly apply its own standards.

C) Termination Without Prejudice

Petitioners argue that their deportation proceedings should be terminated without prejudice to renewal as a result of the pre-hearing regulatory violations described above.

We have held that regulatory violations occurring *during a deportation hearing* that affect fundamental rights derived from the Constitution or federal statutes require such termination, even without a showing of prejudice. Montilla, 926 F.2d at 170 (requiring termination even when the regulatory violation caused no prejudice); Waldron v. United States, 17 F.3d 511, 518 (2d Cir. 1993) (clarifying that Montilla applies only to cases implicating fundamental rights derived from federal statutes or the Constitution). However, we have never decided whether a non-egregious, harmless regulatory violation occurring *prior to a hearing* requires termination.

We hold that pre-hearing regulatory violations are not grounds for termination, absent prejudice that may have affected the outcome of the proceeding, conscience-shocking conduct, or a deprivation of fundamental rights. With regard to termination,

39

we have sought to strike a balance between protecting the rights of aliens, deterring government misconduct, and enabling reasonably efficient law enforcement.  See Montilla, 926 F.2d 168-69; Waldron, 17 F.3d at 518.  In the case of harmless, non-egregious, pre-hearing violations, termination would provide no benefit other than a windfall delay to the deportable alien.  Unlike a violation occurring during a hearing, the alien's second deportation hearing would be no more fair than, or even different from, the first.  Similarly, there are no societal benefits from entitling deportable aliens to extend their time in the United States because of harmless technical violations of regulations in the pre-hearing phase.

With regard to deterrence and efficiency, termination for pre-hearing regulatory violations would have little deterrent effect, and the resulting burden on enforcement operations would be substantial.  The enforcement of immigration laws is subject to significant resource constraints.  Forcing the system to litigate every regulatory dispute, no matter how harmless or technical, as a routine part of deportation proceedings would impose a burden of far greater magnitude than any benefit to be gained.

In INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), the Court denied suppression for routine Fourth Amendment violations in deportation proceedings because, inter alia, an exclusionary rule

40

would provide little deterrent effect at a great administrative cost. The Court reasoned, in part, that because only a small fraction of deportation cases actually resulted in hearings rather than voluntary departures, any violation would so rarely harm a case that an exclusionary rule would be unlikely to shape agents' behavior. Id. at 1044. The Court also noted that litigating the conduct surrounding an arrest would impose an intolerable administrative burden on the immigration enforcement system. Given that officers may arrest several aliens per day, they "cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest." Id. at 1049. Moreover, deportation hearings, which depend on simplicity and efficiency, would become immensely complicated if testimony had to be heard on the detailed circumstances of each arrest. Id. at 1049.

The tradeoffs in our case are similar. Given the dimensions of the problems in immigration enforcement, arresting officers cannot be expected even to remember each arrest, much less the precise details of what happened and what was said. It would enormously decrease the productivity of such officers to require them to compile extensive contemporaneous documentation regarding the details of each investigation and arrest of an alien solely to rebut allegations of technical, non-prejudicial regulatory violations made well after their memory of events had faded. Nor

41

would the deterrent effect of a termination-without-prejudice remedy be potent given the rarity of formal hearings where such violations would affect an immigration officer's enforcement record and the prospect that such hearings could simply be re-run. In short, using termination as a remedy for pre-hearing violations promises a substantial drain on agency resources with little gain in immigrants' significant rights under the regulations.

It may be that the Montilla/Waldron rule grants remands somewhat more liberally for regulatory violations than the rule that we adopt. But it makes sense to grant remands more frequently for regulatory violations occurring during a hearing because such remands impose a far smaller burden on the agency. For regulatory violations during hearings, there is a trial transcript documenting the proceedings and little need for witnesses or additional documentation. Even there, however, we have limited relief to violations of fundamental rights.

Accordingly, we hold that aliens are not entitled to termination of their proceedings for harmless, non-egregious pre-hearing regulatory violations. Those are the circumstances before us, and we, therefore, reject the petitioners' claims for termination without prejudice.

c) Individual Claims

Najih and Rajah raise additional claims specific to the

42

facts of their cases.  Najih's claims are treated here while Rajah's claim is discussed in Judge Calabresi's opinion also issued today.

Najih claims that there was insufficient evidence to find him removable because the IJ relied on documents attached to the government's brief that were not formally admitted into evidence, never made him plead to the charge, and never held a formal evidentiary hearing on his removability.  Najih does not argue that the evidence relied on by the IJ and the BIA was actually flawed; rather he claims that because of these procedural defects, no evidence of his removability was ever properly presented.

Though informal, the procedure followed below was not so erroneous as to merit a remand.  With regard to the documents on which the IJ relied to establish deportability, the BIA found that the IJ effectively admitted them when he accepted the government's brief.  Najih points to no specific authority indicating that this procedure is improper.  Nor does it appear to have prejudiced him in any way.  The authenticity of the documents is not challenged, and he had notice that the IJ believed they were sufficient to "establish a prima facie case of removability and sustain the charge in the [notice to appear]" when the IJ ruled on his termination motion.  Najih was therefore on notice that he should raise any issues regarding the documents

43

and failed to do so.

With regard to the IJ's failure to make Najih plead, the regulations provide that "[t]he immigration judge shall require the respondent to plead to the notice to appear by stating whether he or she admits or denies the factual allegations and his or her removability . . . ."  8 C.F.R. § 1240.10(c). However, no remand is warranted.  Najih twice refused to plead, preferring to press only his motion for termination.  This claim is therefore forfeited.

With regard to the holding of an evidentiary hearing, the regulations state that the IJ "shall receive evidence as to any unresolved issues, except that no further evidence need be received as to any facts admitted during the pleading."  8 C.F.R. § 1240.10(d).  Given the presence of the documents attached to the government's brief, the lack of any dispute about their authenticity and reliability, and the conclusiveness of the documents as to Najih's immigration status, there were no unresolved issues regarding Najih's removability and hence no need for a hearing.  For these reasons, none of Najih's procedural claims merit a remand.

III.  CONCLUSION

For the foregoing reasons, the petitions for review are denied with the exception of petitioner Rajah whose case is remanded according to the opinion by Judge Calabresi.

44