**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF MINNESOTA,<br><br>        Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; REX W. TILLERSON, Secretary of State; JOHN F. KELLY, Secretary of the Department of Homeland Security; UNITED STATES OF AMERICA,<br><br>        Defendants-Appellants. | No.   17-35105<br><br>D.C. No. 2:17-cv-00141<br>Western District of Washington, Seattle<br><br><br>ORDER |

Before: CANBY, CLIFTON, and FRIEDLAND, Circuit Judges.

This court in a published order previously denied a motion of the government for a stay of a restraining order pending appeal. 847 F.3d 1151 (9th Cir. 2017). That order became moot when this court granted the government's unopposed motion to dismiss its underlying appeal. Order, Mar. 8, 2017. No party has moved to vacate the published order. A judge of this court called for a vote to determine whether the court should grant

en banc reconsideration in order to vacate the published order denying the stay. The matter failed to receive a majority of the votes of the active judges in favor of en banc reconsideration. Vacatur of the stay order is denied. *See U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, (1994) (holding that the "extraordinary remedy of vacatur" is ordinarily unjustified when post-decision mootness is caused by voluntary action of the losing party).

This order is being filed along with the concurrence of Judge Reinhardt and the dissent of Judge Bybee. Filings by other judges may follow.

*Washington v. Trump*, No. 17-35105

REINHARDT, J., concurring in the denial of en banc rehearing:


I concur in our court's decision regarding President Trump's first Executive Order – the ban on immigrants and visitors from seven Muslim countries. I also concur in our court's determination to stand by that decision, despite the effort of a small number of our members to overturn or vacate it. Finally, I am proud to be a part of this court and a judicial system that is independent and courageous, and that vigorously protects the constitutional rights of all, regardless of the source of any efforts to weaken or diminish them.

*Washington v. Trump*, No. 17-35105 (Motions Panel–February 9, 2017)

BYBEE, Circuit Judge, with whom KOZINSKI, CALLAHAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the denial of reconsideration *en banc*.

I regret that we did not decide to reconsider this case *en banc* for the purpose of vacating the panel's opinion. We have an obligation to correct our own errors, particularly when those errors so confound Supreme Court and Ninth Circuit precedent that neither we nor our district courts will know what law to apply in the future.

The Executive Order of January 27, 2017, suspending the entry of certain aliens, was authorized by statute, and presidents have frequently exercised that authority through executive orders and presidential proclamations. Whatever we, as individuals, may feel about the President or the Executive Order,[1] the President's decision was well within the powers of the presidency, and "[t]he wisdom of the policy choices made by [the President] is not a matter for our consideration." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165 (1993).

---

[1] Our personal views are of no consequence. I note this only to emphasize that I have written this dissent to defend an important constitutional principle—that the political branches, informed by foreign affairs and national security considerations, control immigration subject to limited judicial review—and not to defend the administration's policy.

This is not to say that presidential immigration policy concerning the entry of aliens at the border is immune from judicial review, only that our review is limited by *Kleindienst v. Mandel*, 408 U.S. 753 (1972)—and the panel held that limitation inapplicable. I dissent from our failure to correct the panel's manifest error.

## I

In this section I provide background on the source of Congress's and the President's authority to exclude aliens, the Executive Order at issue here, and the proceedings in this case. The informed reader may proceed directly to Part II.

## A

"The exclusion of aliens is a fundamental act of sovereignty." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Congress has the principal power to control the nation's borders, a power that follows naturally from its power "[t]o establish an uniform rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and from its authority to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, and to "declare War," *id.* art. I, § 8, cl. 11. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power . . . ."). The

2

President likewise has some constitutional claim to regulate the entry of aliens into the United States.  "Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'"  *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)).  The foreign policy powers of the presidency derive from the President's role as "Commander in Chief," U.S. Const. art. II, § 2, cl. 1, his right to "receive Ambassadors and other public Ministers," *id.* art. II, § 3, and his general duty to "take Care that the Laws be faithfully executed," *id. See Garamendi*, 539 U.S. at 414.  The "power of exclusion of aliens is also inherent in the executive."  *Knauff*, 338 U.S. at 543.

In the Immigration and Nationality Act of 1952, Congress exercised its authority to prescribe the terms on which aliens may be admitted to the United States, the conditions on which they may remain within our borders, and the requirements for becoming naturalized U.S. citizens.  8 U.S.C. § 1101 *et seq.* Congress also delegated authority to the President to suspend the entry of "any class of aliens" as he deems appropriate:

Whenever the President finds that the entry of any aliens or of any

class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*Id.* § 1182(f). Many presidents have invoked the authority of § 1182(f) to bar the entry of broad classes of aliens from identified countries.[2]

In Executive Order No. 13769, the President exercised the authority granted in § 1182(f). Exec. Order No. 13769 § 3(c) (Jan. 27, 2017), *revoked by* Exec. Order No. 13780 § 1(i) (Mar. 6, 2017). The Executive Order covered a number of subjects. Three provisions were particularly relevant to this litigation. First, the Executive Order found that "the immigrant and nonimmigrant entry into the United States of aliens from [seven] countries . . . would be detrimental to the interests of the United States" and ordered the suspension of entry for nationals (with certain exceptions) from those countries for 90 days. *Id.* The seven countries were Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. Second, it directed the Secretary of State to suspend the U.S. Refugee Admissions Program (USRAP) for 120 days.

---

[2] *See*, *e.g.*, Exec. Order No. 12324 (Sept. 29, 1981) (Reagan and Haiti); Proclamation No. 5517 (Aug. 22, 1986) (Reagan and Cuba); Exec. Order No. 12807 (May 24, 1992) (George H.W. Bush and Haiti); Proclamation No. 6958 (Nov. 22, 1996) (Clinton and Sudan); Proclamation No. 7359 (Oct. 10, 2000) (Clinton and Sierra Leone); Exec. Order No. 13276 (Nov. 15, 2002) (George W. Bush and Haiti); Exec. Order No. 13692 (Mar. 8, 2015) (Obama and Venezuela); Exec. Order No. 13726 (Apr. 19, 2016) (Obama and Libya).

However, exceptions could be made "on a case-by-case basis" in the discretion of the Secretaries of State and Homeland Security. Once USRAP resumed, the Secretary of State was "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual [was] a minority religion in the individual's country of nationality." *Id.* § 5(a), (b), (e). Third, it suspended indefinitely the entry of Syrian refugees. *Id.* § 5(c).

B

Three days after the President signed the Executive Order, the States of Washington and Minnesota brought suit in the Western District of Washington seeking declaratory and injunctive relief on behalf of their universities, businesses, citizens, and residents that were affected by the Executive Order in various ways. The States also sought a temporary restraining order (TRO). On February 3, 2017, following a hearing, the district court, without making findings of fact or conclusions of law with respect to the merits of the suit, issued a nationwide TRO against the enforcement of §§ 3(c), 5(a)–(c), (e). The district court proposed further briefing by the parties and a hearing on the States' request for a preliminary injunction.[3]

---

[3] That same day, the district court for the District of Massachusetts denied a preliminary injunction to petitioners challenging the Executive Order on equal protection, Establishment Clause, due process, and APA grounds. *Louhghalam v.*

The United States sought a stay of the district court's order pending an appeal. A motions panel of our court, on an expedited basis (including oral argument by phone involving four time zones), denied the stay. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).

Among other things, the panel drew three critical conclusions. First, the panel held that, although we owe deference to the political branches, we can review the Executive Order for constitutionality under the same standards as we would review challenges to domestic policies. *See id.* at 1161–64. Second, the panel found that the States were likely to succeed on their due process arguments because "the Executive Order [does not] provide[] what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." *Id.* at 1164. Third, the panel found that there were at least "significant constitutional questions" under the Establishment Clause raised by the fact that the seven countries identified in the Executive Order are principally Muslim countries and the President, before and after his election, made reference to "a Muslim ban." *Id.* at 1168.

---

*Trump*, No. 17-10154-NMG, 2017 WL 479779 (D. Mass. Feb. 3, 2017). The following week, the district court for the Eastern District of Virginia granted a preliminary injunction against enforcement of the Executive Order in Virginia. The court's sole grounds were based on the Establishment Clause. *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 2017 WL 580855 (E.D. Va. Feb. 13, 2017).

In response to the panel's decision not to stay the district court's TRO pending appeal, a judge of our court asked for *en banc* review. The court invited the parties to comment on whether the entire court should review the judgment. The U.S. Department of Justice asked that the panel hold the appeal while the administration considered the appropriate next steps and vacate the opinion upon the issuance of any new executive order. A majority of the court agreed to stay the *en banc* process. In the end, the President issued a new Executive Order on March 6, 2017, that referred to the panel's decision and addressed some of the panel's concerns. In light of the new Executive Order, the Department of Justice moved to dismiss the appeal in this case. The panel granted the motion to dismiss but did not vacate its precedential opinion.[4]

Ordinarily, when an appeal is dismissed because it has become moot, any opinions previously issued in the case remain on the books. *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) ("Judicial precedents are presumptively correct and valuable to the legal community as a whole. They . . . should stand unless a court concludes that the public interest would be served by a

---

[4] Proceedings in the original suit filed by Washington and Minnesota are still pending in the Western District of Washington. The State of Hawaii also filed suit in the District of Hawaii and has asked for a TRO enjoining the second Executive Order. *See* Plaintiffs' Motion for Temporary Restraining Order, *Hawai'i v. Trump*, No. 1:17-cv-00050-DKW-KSC (D. Haw. Mar. 8, 2017), ECF No. 65.

vacatur." (citation omitted)). The court, however, has discretion to vacate its opinion to "clear[] the path for future relitigation of the issues between the parties," *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or where "exceptional circumstances . . . counsel in favor of such a course," *U.S. Bancorp Mortg.*, 513 U.S. at 29. We should have exercised that discretion in this case because the panel made a fundamental error.[5] It neglected or overlooked critical cases by the Supreme Court and by our court making clear that when we are reviewing decisions about who may be admitted into the United States, we must defer to the judgment of the political branches.[6] That does not mean that we have no power of judicial review at all, but it does mean that our authority to second guess or to probe the decisions of those branches is carefully circumscribed. The panel's analysis conflicts irreconcilably with our prior cases. We had an obligation to

---

[5] We have previously said that it is procedurally proper for a judge "to seek an en banc rehearing for the purpose of vacating [a panel's] decision." *United States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010).

[6] To be clear, the panel made several other legal errors. Its holding that the States were likely to succeed on the merits of their procedural due process claims confounds century-old precedent. And its unreasoned assumption that courts should simply plop Establishment Clause cases from the domestic context over to the foreign affairs context ignores the realities of our world. But these errors are not what justified vacatur. Instead, it is the panel's treatment of *Kleindienst v. Mandel*, 408 U.S. 753 (1972), that called for an extraordinary exercise of our discretion to vacate the panel's opinion.

vacate the panel's opinion in order to resolve that conflict and to provide consistent guidance to district courts and future panels of this court.

## II

The panel began its analysis from two important premises: first, that it is an "uncontroversial principle" that we "owe substantial deference to the immigration and national security policy determinations of the political branches," *Washington*, 847 F.3d at 1161; second, that courts can review constitutional challenges to executive actions, *see id.* at 1164. I agree with both of these propositions. Unfortunately, that was both the beginning and the end of the deference the panel gave the President.

How do we reconcile these two titan principles of constitutional law? It is indeed an "uncontroversial principle" that courts must defer to the political judgment of the President and Congress in matters of immigration policy. The Supreme Court has said so, plainly and often. *See, e.g., Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."); *Harisiades*, 342 U.S. at 590 ("[N]othing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require us to equate our political judgment with

9

that of Congress."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210

(1953) ("Courts have long recognized the power to expel or exclude aliens as a

fundamental sovereign attribute exercised by the Government's political

departments largely immune from judicial control."); *Henderson v. Mayor of N.Y.*,

92 U.S. (2 Otto) 259, 270–71 (1876).  On the other hand, it seems equally

fundamental that the judicial branch is a critical backstop to defend the rights of

individuals against the excesses of the political branches.  *See INS v. Chadha*, 462

U.S. 919, 941 (1983) (reviewing Congress's use of power over aliens to ensure that

"the exercise of that authority does not offend some other constitutional

restriction" (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976))).

The Supreme Court has given us a way to analyze these knotty questions,

but it depends on our ability to distinguish between two groups of aliens:  those

who are present within our borders and those who are seeking admission.  As the

Court explained in *Leng May Ma v. Barber*,

> It is important to note at the outset that our immigration laws
> have long made a distinction between those aliens who have come to
> our shores seeking admission, . . . and those who are within the United
> States after an entry, irrespective of its legality.  In the latter instance
> the Court has recognized additional rights and privileges not extended
> to those in the former category who are merely "on the threshold of
> initial entry."

357 U.S. 185, 187 (1958) (quoting *Mezei*, 345 U.S. at 212).  The panel did not

10

recognize that critical distinction and it led to manifest error. The panel's decision is not only inconsistent with clear Supreme Court authority, but the panel missed a whole bunch of our own decisions as well.

A

The appropriate test for judging executive and congressional action affecting aliens who are outside our borders and seeking admission is set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). In *Mandel*, the government had denied a visa to a Marxist journalist who had been invited to address conferences at Columbia, Princeton, and Stanford, among other groups. Mandel and American university professors brought facial and as-applied challenges under the First and Fifth Amendments. The Court first made clear that Mandel himself, "as an unadmitted and nonresident alien, had no constitutional right of entry." *Id.* at 762. Then it addressed the First Amendment claims of the professors who had invited him. Recognizing that "First Amendment rights [were] implicated" in the case, the Court declined to revisit the principle that the political branches may decide whom to admit and whom to exclude. *Id.* at 765. It concluded that when the executive has exercised its authority to exclude aliens "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment

11

interests of those who seek personal communication with the applicant." *Id.* at 770.

In this case, the government argued that *Mandel* provided the proper framework for analyzing the States' claims. The panel, however, tossed *Mandel* aside because it involved only a decision by a consular officer, not the President. *See Washington*, 847 F.3d at 1162 ("The present case, by contrast, is not about the application of a specifically enumerated congressional policy to the particular facts presented in an individual visa application. Rather the States are challenging the President's *promulgation* of sweeping immigration policy."). Two responses. First, the panel's declaration that we cannot look behind the decision of a consular officer, but can examine the decision of the President stands the separation of powers on its head. We give deference to a consular officer making an individual determination, but not the President when making a broad, national security-based decision? With a moment's thought, that principle cannot withstand the gentlest inquiry, and we have said so. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008) ("We are unable to distinguish *Mandel* on the grounds that the exclusionary decision challenged in that case was not a consular visa denial, but rather the Attorney General's refusal to waive Mandel's inadmissibility. The holding is plainly stated in terms of the power delegated by Congress to 'the

12

Executive.'  The Supreme Court said nothing to suggest that the reasoning or outcome would vary according to which executive officer is exercising the Congressionally-delegated power to exclude.").  Second, the promulgation of broad policy is precisely what we expect the political branches to do; Presidents rarely, if ever, trouble themselves with decisions to admit or exclude individual visa-seekers.  *See Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency.").  If the panel is correct, it just wiped out any principle of deference to the executive.

Worse, the panel's decision missed entirely *Fiallo v. Bell*, 430 U.S. 787 (1977), and *Fiallo* answers the panel's reasons for brushing off *Mandel*.  In *Fiallo*, the plaintiff brought a facial due process challenge to immigration laws giving preferential treatment to natural mothers of illegitimate children.  As in *Mandel*, the constitutional challenge in *Fiallo* was "based on [the] constitutional rights of citizens."  *Id.* at 795.  The Court acknowledged that the challenge invoked "'double-barreled' discrimination based on sex and illegitimacy."  *Id.* at 794.  Either ground, if brought in a suit in a domestic context, would have invoked some kind of heightened scrutiny.  *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (sex

13

discrimination); *Trimble v. Gordon*, 430 U.S. 762, 769 (1977) (illegitimacy).

Rejecting the claim that "the Government's power in this area is never subject to judicial review," *Fiallo*, 430 U.S. at 795–96, 795 n.6, the Court held that *Mandel*'s "facially legitimate and bona fide reason" test was the proper standard: "We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795; *see also id.* at 794 (rejecting "the suggestion that more searching judicial scrutiny is required"). Importantly, the Court reached that conclusion despite the fact the immigration laws at issue promulgated "sweeping immigration policy," *Washington*, 847 F.3d at 1162, just as the Executive Order did.

The panel's holding that "exercises of policymaking authority at the highest levels of the political branches are plainly not subject to the *Mandel* standard," *id.*, is simply irreconcilable with the Supreme Court's holding that it could "see no reason to review the broad congressional policy choice at issue [there] under a more exacting standard than was applied in *Kleindienst v. Mandel*," *Fiallo*, 430 U.S. at 795.

*Fiallo* wasn't the only Supreme Court case applying *Mandel* that the panel missed. In *Kerry v. Din*, 135 S. Ct. 2128 (2015), the Court confronted a case in

14

which Din (a U.S. citizen) claimed that the government's refusal to grant her Afghani husband a visa violated her own constitutional right to live with her husband. A plurality held that Din had no such constitutional right. *Id.* at 2131 (plurality opinion). Justice Kennedy, joined by Justice Alito, concurred in the judgment, and we have held that his opinion is controlling. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016). For purposes of the case, Justice Kennedy assumed that Din had a protected liberty interest, but he rejected her claim to additional procedural due process. "The conclusion that Din received all the process to which she was entitled finds its most substantial instruction in the Court's decision in *Kleindienst v. Mandel*." *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment) (citation omitted). After reciting *Mandel*'s facts and holding, Justice Kennedy concluded that "[t]he reasoning and the holding in *Mandel* control here. That decision was based upon due consideration of the congressional power to make rules for the exclusion of aliens, and the ensuing power to delegate authority to the Attorney General to exercise substantial discretion in that field." *Id.* at 2140. Once the executive makes a decision "on the basis of a facially legitimate and bona fide reason," the courts may "'neither look behind the exercise of that discretion, nor test it by balancing its justification against' the constitutional interests of citizens the visa denial might implicate." *Id.*

15

(quoting *Mandel*, 408 U.S. at 770).  Applying *Mandel*, Justice Kennedy concluded

that "the Government satisfied any obligation it might have had to provide Din

with a facially legitimate and bona fide reason for its action when it provided

notice that her husband was denied admission to the country under [8 U.S.C.] §

1182(a)(3)(B)." *Id.* at 2141.  No more was required, and "[b]y requiring the

Government to provide more, the [Ninth Circuit] erred in adjudicating Din's

constitutional claims." *Id.*

The importance and continuing applicability of the framework set out in

*Mandel* and applied in *Fiallo* and *Din* has been recognized in circumstances

remarkably similar to the Executive Order.  After the attacks of September 11,

2001, the Attorney General instituted the National Security Entry-Exit Registration

System.  That program required non-immigrant alien males (residing in the United

States) over the age of sixteen from twenty-five countries—twenty-four Muslim-

majority countries plus North Korea—to appear for registration and fingerprinting.

One court referred to the program as "enhanced monitoring." *See Rajah v.*

*Mukasey*, 544 F.3d 427, 433–34, 439 (2d Cir. 2008) (describing the program).[7]

The aliens subject to the program filed a series of suits in federal courts across the

---

[7] The aliens subject to the program were designated by country in a series of
notices.  The first notice covered five countries:  Iran, Iraq, Libya, Sudan, and
Syria. *See Rajah*, 544 F.3d at 433 n.3.

16

United States. They contended that the program unconstitutionally discriminated against them on the basis of "their religion, ethnicity, gender, and race." *Id.* at 438. Similar to the claims here, the petitioners argued that the program "was motivated by an improper animus toward Muslims." *Id.* at 439.

Citing *Fiallo* and applying the *Mandel* test, the Second Circuit held that "[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review." *Id.* at 438 (alteration in original) (citation omitted). The court then found "a facially legitimate and bona fide reason for" the registration requirements because the countries were "selected on the basis of national security criteria." *Id.* at 438–39. The court rejected as having "no basis" the petitioners' claim of religious animus. *Id.* at 439. The court observed that "one major threat of terrorist attacks comes from radical Islamic groups." *Id.* It added:

> Muslims from non-specified countries were not subject to registration. Aliens from the designated countries who were qualified to be permanent residents in the United States were exempted whether or not they were Muslims. The program did not target only Muslims: non-Muslims from the designated countries were subject to registration.

*Id.* Finally, the court refused to review the program for "its effectiveness and wisdom" because the court "ha[d] no way of knowing whether the Program's enhanced monitoring of aliens ha[d] disrupted or deterred attacks. In any event,

17

such a consideration [was] irrelevant because an *ex ante* rather than *ex post* assessment of the Program [was] required under the rational basis test." *Id.* The Second Circuit thus unanimously rejected the petitioners' constitutional challenges and "join[ed] every circuit that ha[d] considered the issue in concluding that the Program [did] not violate Equal Protection guarantees." *Id.*; *see Malik v. Gonzales*, 213 F. App'x 173, 174–75 (4th Cir. 2007); *Kandamar v. Gonzales*, 464 F.3d 65, 72–74 (1st Cir. 2006); *Zafar v. U.S. Attorney Gen.*, 461 F.3d 1357, 1367 (11th Cir. 2006); *Hadayat v. Gonzales*, 458 F.3d 659, 664–65 (7th Cir. 2006); *Shaybob v. Attorney Gen.*, 189 F. App'x 127, 130 (3d Cir. 2006); *Ahmed v. Gonzales*, 447 F.3d 433, 439 (5th Cir. 2006); *see also Adenwala v. Holder*, 341 F. App'x 307, 309 (9th Cir. 2009); *Roudnahal v. Ridge*, 310 F. Supp. 2d 884, 892 (N.D. Ohio 2003). The panel was oblivious to this important history.

The combination of *Mandel*, *Fiallo*, and *Din*, and the history of their application to the post-9/11 registration program, is devastating to the panel's conclusion that we can simply apply ordinary constitutional standards to immigration policy. Compounding its omission, the panel missed all of our own cases applying *Mandel* to constitutional challenges to immigration decisions. *See*, *e.g.*, *Cardenas*, 826 F.3d at 1171 (discussing *Mandel* and *Din* extensively as the "standard of judicial review applicable to the visa denial" where petitioner alleged

18

due process and equal protection violations); *An Na Peng v. Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012) (applying the *Mandel* standard to reject a lawful permanent resident's equal protection challenge against a broad policy); *Bustamante*, 531 F.3d at 1060 (applying *Mandel* to a due process claim and describing *Mandel* as "a highly constrained review"); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 978–79 (9th Cir. 2006) (applying *Mandel* to a due process challenge to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006) (using the *Mandel* standard to address an alien's challenge to the executive's denial of parole to temporarily enter the United States, and finding the executive's reasons "were not facially legitimate and bona fide"); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003) (applying *Fiallo* to a facial equal protection challenge based on "former marital status"); *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001) (applying *Mandel* when an alien challenged the revocation of his visa); *see also Andrade-Garcia v. Lynch*, 828 F.3d 829, 834–35 (9th Cir. 2016) (discussing review under *Mandel*). Like the Second Circuit in *Rajah*, we too have repeatedly "equated [the *Mandel*] standard of review with rational basis review." *Barthelemy*, 329 F.3d at 1065; *see An Na Peng*, 673 F.3d at 1258; *Ablang v. Reno*, 52 F.3d 801, 805 (9th Cir. 1995). It is equally clear from our cases that we apply *Mandel* whether we are

19

dealing with an individual determination by the Attorney General or a consular officer, as in *Mandel* and *Din*, or with broad policy determinations, as in *Fiallo*. The panel's clear misstatement of law justifies vacating the opinion.

B

Applying *Mandel* here, the panel's error becomes obvious: the Executive Order was easily "facially legitimate" and supported by a "bona fide reason." As I have quoted above, § 1182(f) authorizes the President to suspend the entry of "any class of aliens" as he deems appropriate:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).[8] Invoking this authority and making the requisite findings, the President "proclaim[ed] that the immigrant and nonimmigrant entry into the United States of aliens from [seven] countries . . . would be detrimental to the interests of

---

[8] Regrettably, the panel never once mentioned § 1182(f), nor did it acknowledge that when acting pursuant it to it, the government's "authority is at its maximum, for it includes all that [the President] possesses in his own right plus all the Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring); *see Knauff*, 338 U.S. at 542 ("When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.").

20

the United States," and he suspended their entry for 90 days. Exec. Order No. 13769 § 3(c). As the Executive Order further noted, the seven countries—Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—had all been previously identified by either Congress, the Secretary of State, or the Secretary of Homeland Security (all in prior administrations) as "countries or areas of concern" because of terrorist activity.[9] The President noted that we "must be vigilant" in light of "deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest." *Id.* § 1. The President's actions might have been more aggressive than those of his predecessors, but that was his prerogative. Thus, the President's actions were supported by a "facially legitimate and bona fide" reason.

Justice Kennedy indicated in *Din* that it might have been appropriate to "look behind" the government's exclusion of Din's husband if there were "an affirmative showing of bad faith on the part of the consular officer who denied [the

---

[9] *Iraq and Syria*: Congress has disqualified nationals or persons who have been present in Iraq and Syria from eligibility for the Visas Waiver Program. 8 U.S.C. § 1187(a)(12)(A)(i)(I), (ii)(I).

*Iran, Sudan, and Syria*: Under § 1187(a)(12)(A)(i)(II), (ii)(II), the Secretary of State has designated Iran, Sudan, and Syria as state sponsors of terrorism because the "government . . . repeatedly provided support of acts of international terrorism."

*Libya, Somalia, and Yemen*: Similarly, under § 1187(a)(12)(A)(i)(III), (ii)(III), the Secretary of Homeland Security has designated Libya, Somalia, and Yemen as countries where a foreign terrorist organization has a significant presence in the country or where the country is a safe haven for terrorists.

21

husband's] visa." *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Because the panel never discussed *Din*, let alone claimed that Justice Kennedy's comment might allow us to peek behind the facial legitimacy of the Executive Order, I need not address the argument in detail. Suffice it to say, it would be a huge leap to suggest that *Din*'s "bad faith" exception also applies to the motives of broad-policy makers as opposed to those of consular officers.

Even if we have questions about the basis for the President's ultimate findings—whether it was a "Muslim ban" or something else—we do not get to peek behind the curtain. So long as there is *one* "facially legitimate and bona fide" reason for the President's actions, our inquiry is at an end. As the Court explained in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999):

> The Executive should not have to disclose its "real" reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even it if did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.

*Id.* at 491; *see Mezei*, 345 U.S. at 210–12; *Knauff*, 338 U.S. at 543.

The panel faulted the government for not coming forward in support of the Executive Order with evidence—including "classified information." *Washington*, 847 F.3d at 1168 & nn.7–8. First, that is precisely what the Court has told us we

22

should not do.  Once the facial legitimacy is established, we may not "look behind the exercise of that discretion."  *Fiallo*, 430 U.S. at 795–96 (quoting *Mandel*, 408 U.S. at 770).  The government may provide more details "when it sees fit" or if Congress "requir[es] it to do so," but we may not require it.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment).  Second, that we have the capacity to hold the confidences of the executive's secrets does not give us the right to examine them, even under the most careful conditions.  As Justice Kennedy wrote in *Din*, "in light of the national security concerns the terrorism bar addresses[,] . . . even if . . . sensitive facts could be reviewed by courts *in camera*, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure."  *Id.*; *see Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.  Nor can courts sit in camera in order to be taken into executive confidences.").  When we apply the correct standard of review, the President does not have to come forward with supporting documentation to explain the basis for the Executive Order.

The panel's errors are many and obvious.  Had it applied the proper standard, the panel should have stopped here and issued the stay of the district

court's TRO.  Instead, the panel opinion stands contrary to well-established separation-of-powers principles.  We have honored those principles in our prior decisions; the panel failed to observe them here.  If for no other reason, we should have gone *en banc* to vacate the panel's opinion in order to keep our own decisions straight.

## III

We are all acutely aware of the enormous controversy and chaos that attended the issuance of the Executive Order.  People contested the extent of the national security interests at stake, and they debated the value that the Executive Order added to our security against the real suffering of potential emigres.  As tempting as it is to use the judicial power to balance those competing interests as we see fit, we cannot let our personal inclinations get ahead of important, overarching principles about who gets to make decisions in our democracy.  For better or worse, every four years we hold a contested presidential election.  We have all found ourselves disappointed with the election results in one election cycle or another.  But it is the best of American traditions that we also understand and respect the consequences of our elections.  Even when we disagree with the judgment of the political branches—and perhaps *especially* when we disagree—we have to trust that the wisdom of the nation as a whole will prevail in the end.

24

Above all, in a democracy, we have the duty to preserve the liberty of the people by keeping the enormous powers of the national government separated. We are judges, not Platonic Guardians. It is our duty to say what the law is, and the meta-source of our law, the U.S. Constitution, commits the power to make foreign policy, including the decisions to permit or forbid entry into the United States, to the President and Congress. We will yet regret not having taken this case *en banc* to keep those lines of authority straight.

Finally, I wish to comment on the public discourse that has surrounded these proceedings. The panel addressed the government's request for a stay under the worst conditions imaginable, including extraordinarily compressed briefing and argument schedules and the most intense public scrutiny of our court that I can remember. Even as I dissent from our decision not to vacate the panel's flawed opinion, I have the greatest respect for my colleagues. The personal attacks on the distinguished district judge and our colleagues were out of all bounds of civic and persuasive discourse—particularly when they came from the parties. It does no credit to the arguments of the parties to impugn the motives or the competence of the members of this court; *ad hominem* attacks are not a substitute for effective advocacy. Such personal attacks treat the court as though it were merely a political forum in which bargaining, compromise, and even intimidation are acceptable

25

principles.  The courts of law must be more than that, or we are not governed by law at all.

I dissent, respectfully.